Sealed

Public and unofficial staff access
to this instrument are
prohibited by court order.

United States District Court
Southern District of Texas
FILED

OCT 1 2010

David J. Bradley, Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *ex rel.* RoseMarie De Souza | § | CIVIL ACTION NO. 10-465 |
| and RoseMarie De Souza | § | |
| individually, et al. | § | |
| Plaintiffs, | § | FILED UNDER SEAL |
| | § | |
| v. | § | |
| | § | |
| ASTRAZENECA PLC, | § | |
| ASTRAZENECA | § | |
| PHARMACEUTICALS, LP, | § | |
| Defendants. | § | |

## RELATOR ROSEMARIE DE SOUZA'S OPPOSED MOTION TO DETERMINE FIRST-TO-FILE STATUS

RoseMarie De Souza files this Motion to Determine First-to-File Status and in support shows the Court as follows.

### I. Summary of Argument

RoseMarie De Souza is the first-to-file this *qui tam* action challenging the JUPITER[1] Scheme—AstraZeneca's nationwide, off-label marketing scheme to promote Crestor for reducing heart attacks, strokes, and mortality. Layne Foote, another relator, has filed a competing *qui tam* complaint. Although Foote filed his original complaint in Delaware 10 days before De Souza filed her original

---

[1] JUPITER is an acronym for Justification for the Use of Statins in Prevention: An Intervention Trial Evaluating Rosuvastatin.

TRUE COPY I CERTIFY
ATTEST:
DAVID J BRADLEY, Clerk of Court
By _____
Deputy Clerk

complaint in this Court, Foote is not the first-to-file on the JUPITER Scheme. Thus, De Souza asks this Court hold that De Souza is the first-to-file for the Crestor off-label marketing scheme related to the JUPITER study ("JUPITER Scheme").

The first-to-file rule in 31 U.S.C. § 3730(b)(5) only bars a later-filed complaint if it alleges the same essential facts alleged in a previously filed complaint. Foote fails to allege the JUPITER Scheme's essential facts, including essential facts about its method of off-label promotion. Most importantly, Foote never pleaded that AstraZeneca promoted Crestor as a drug that reduced mortality—the off-label indication that was the catalyst for the JUPITER Scheme.

In addition, he also fails to sufficiently plead the JUPITER Scheme. Federal Rule of Civil Procedure 9(b) requires allegations of fraud to be stated with particularity. To be considered first-filed, a complaint must be sufficient under Rule 9(b). Foote filed a deficient, placeholder complaint that prevents him from being considered first-to-file.

Allowing a relator such as Foote to act as placeholder contravenes the policy behind the False Claims Act ("FCA"). De Souza, not Foote, has all the essential information about the scheme necessary to equip the government to successfully prosecute the *qui tam* action.

2

Finally, failure of the Court to make an early determination of De Souza's first-to-file status would work a significant harm to De Souza and, as a practical matter, would make proceeding with her claim impossible.

## II. Underlying Facts and Procedure

This matter began when AstraZeneca began marketing Crestor as a drug that could reduce mortality in certain patients. It culminated with De Souza filing this lawsuit after being fired for doing exactly what AstraZeneca told her to do. In the meantime, Foote, an employee who was fired before the JUPITER Scheme ended for reasons not related to the scheme, filed a placeholder suit that failed to allege the essential facts necessary to support a claim based on the JUPITER Scheme.

### A. AstraZeneca develops the JUPITER Scheme.

The following are the essential facts of the JUPITER Scheme, which De Souza pleads. Foote does not.

At the American Heart Association conference in New Orleans in 2008, AstraZeneca announced the results of a study that showed that Crestor reduces certain patients' risk of heart attacks, strokes, and mortality.[2] This unprecedented finding provided the impetus for the JUPITER Scheme.

Immediately after the announcement, AstraZeneca sent an internal briefing on JUPITER to its sales representatives. In it, AstraZeneca noted Crestor's ability

---

[2] De Souza Compl. at 16-17.

to reduce mortality.[3] In conjunction with that briefing, AstraZeneca conducted a mandatory, two-hour teleconference on the results of the JUPITER study.[4] It also rushed to its sales force purple and yellow envelopes. These envelopes contained the JUPITER study summary, the JUPITER study reprint that had been distributed at the convention, and instructions to actively distribute the envelopes to specified top-prescribing statin doctors.[5]

Using the information in these envelopes, AstraZeneca marketed Crestor as a drug that reduces mortality. This is an off-label indication never approved by the Food & Drug Administration ("FDA"). It also marketed the drug for heart attacks and strokes, which was an indication that was off-label then, but later approved.[6] "Off-label marketing" refers to promotion of a drug for a use/purpose not approved by the FDA. It is illegal under the FCA.[7] AstraZeneca also promoted Crestor's off-label indications by paying "coachable" speakers to deliver a scripted message on the JUPITER results and Crestor's off-label uses. It often selected doctors as speakers to reward them for being high-prescribers and paid them above-market honoraria.[8]

---

[3] De Souza Compl., Ex. 4.
[4] De Souza Compl. at 17.
[5] De Souza Compl. at 17. Crestor is a type of statin drug.
[6] De Souza Compl. at 17-18.
[7] See 31 U.S.C. §§ 3729–3732.
[8] De Souza Compl. at 21-22. The Anti-Kickback Statute makes it illegal for an individual to knowingly and willfully offer or pay remuneration in cash or in kind to induce a physician to

4

To cover-up its conduct, AstraZeneca later ordered its sales representatives to destroy the purple and yellow envelopes.[9] De Souza's District Sales Manager, Eric Reyes, sent similar instructions in an e-mail along with a request to confirm that the sales representatives had complied.[10] In October 2009, AstraZeneca's legal counsel investigated De Souza's call notes for JUPITER-related issues.[11] Then, on February 2, 2010, AstraZeneca sent an e-mail to De Souza stating that an internal review uncovered inappropriate references to JUPITER during her sales efforts and that the company was taking remedial action. Later the same day, AstraZeneca terminated De Souza and nearly 100 other sales representatives to cover up the off-label marketing and kickbacks in the JUPITER Scheme.[12]

**B.  De Souza pleads the essential facts in her complaint.**

On February 15, 2010, De Souza filed her original *qui tam* complaint in this Court. On February 26, 2010, she filed an amended complaint to make non-material modifications ("De Souza Complaint"). The De Souza Complaint pleads the JUPITER Scheme sufficiently by detailing the essential facts of the JUPITER Scheme, including: (1) the study results announced at the New Orleans conference; (2) the JUPITER study results showing that Crestor reduces heart attacks, strokes,

---

order a good or service that is reimbursed by a federal healthcare program. *See* Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).
[9] De Souza Compl., Ex. 6.
[10] De Souza Compl., Ex. 5.
[11] De Souza Compl. at 19-21. Call notes are follow-up notes recorded after a sales representative meets with a doctor who may be a potential customer of AstraZeneca. De Souza Compl. at 19.
[12] De Souza Compl. at 21.

and *mortality*—JUPITER's landmark outcome;[13] (3) internal briefing mentioning the mortality indication; (4) the mandatory, nationwide teleconference; (5) the rush-delivery of purple and yellow envelopes; (6) AstraZeneca's instructions to distribute the envelopes to the top-prescribing statin doctors; (7) that AstraZeneca marketed Crestor off-label for reducing heart attacks, strokes, *and mortality*; (8) the kickbacks given to speakers; (9) the spoliation of evidence and cover-up; (10) AstraZeneca's legal investigation of JUPITER in De Souza's call notes; and (11) AstraZeneca's nationwide termination and reprimanding of sales representatives. De Souza also attached to her complaint the envelopes and briefing.[14]

## C.    Foote's complaint fails to plead JUPITER Scheme's essential facts.

AstraZeneca fired Foote in October 2009. On February 5, 2010, he filed a *qui tam* complaint in the United States District Court for the District of Delaware ("Foote Complaint").[15] Unlike the De Souza Complaint, the Foote Complaint fails to plead the JUPITER Scheme's essential facts. In fact, Foote could not have been part of the JUPITER Scheme because AstraZeneca fired him in October 2009— several months before the nationwide termination of sales representatives for the JUPITER Scheme. Foote only broadly alleges the JUPITER Scheme by pleading

---

[13] *See* De Souza Compl. at 17. On February 8, 2010, the FDA approved Crestor for reducing heart attacks and strokes but never approved the reduction in mortality indication.

[14] *See* De Souza Compl. at 17-18; Ex. 2 (JUPITER Summary in the purple envelope); Ex. 3 (JUPITER Study reprint in the yellow envelope); Ex. 4 (AstraZeneca Internal Briefing on JUPITER Study).

[15] Ex. A, Foote Complaint.

6

the following facts:[16] (1) in March 2008, AstraZeneca halted JUPITER because the results showed that Crestor reduces heart attacks and strokes; (2) AstraZeneca promoted Crestor for these two indications through a sales representative presentation in mid-2008 and a speaker program in early 2009; (3) on July 15, 2009, District Sales Manager Dick Hodge sent an e-mail to representatives encouraging them to promote JUPITER's results that Crestor reduces heart attacks and strokes; and (4) on February 4, 2010, AstraZeneca's U.S. President, Richard Fante sent an internal message regarding inappropriate references to JUPITER and remedial action.

Realizing his JUPITER allegations could not withstand a motion to dismiss under Rule 9(b), Foote added an additional relator, Mark Lorden, on March 31, 2010 in an amended complaint ("Foote/Lorden Complaint").[17] AstraZeneca had fired Lorden as a part of the February 2010 cover-up. Foote chose to add a second relator and dilute his share of any potential recovery because he knew he needed to plead the JUPITER Scheme more thoroughly to satisfy Rule 9(b)'s requirements. But even using Lorden, De Souza is still the only relator to plead that AstraZeneca marketed Crestor using the significant result of the JUPITER study—that Crestor reduces mortality.

---

[16] *See* Foote Compl. at 51-53.
[17] Ex. B, Foote/Lorden Complaint.

### D.    Scores of Government Representatives attend De Souza interview.

On April 15, 2010, the government sent a letter to De Souza's counsel to inform him of Foote's competing *qui tam* complaint.[18]   Before interviewing Foote or Lorden, on May 4, 2010, the government conducted a well-attended relator interview of De Souza.  Representatives of multiple federal agencies located in the Southern District of Texas attended the meeting, including the United States Attorney's Office[19] and its Affirmative Civil Enforcement program,[20] the Department of Defense,[21] the Office of Inspector General for the Department of Health and Human Services,[22] the Office of the Inspector General for the Office of Personnel Management,[23] and the Federal Bureau of Investigation.[24]   Also in attendance, either in person or by telephone, were representatives of other federal and state agencies.[25]

### III. Argument & Authority

When an individual brings a FCA action, "no person other than the

---

[18] In the letter, the government enclosed the Foote Complaint and the Foote/Lorden Complaint. According to the letter, the Delaware court issued an order allowing the government to reveal these pleadings to De Souza's counsel despite the seal.

[19] Linda Evans, Sam Louis, and Jill Venezia.

[20] Dianne Otto.

[21] Rose Atilano and Sean Morrissey.

[22] Veronica Osborne.

[23] Yasmine Rivera.

[24] David Neider.

[25] Kim Friday (DOJ/Civil Fraud - D.C.), Allen Gordies (DOJ/Consumer Litigation - D.C.), Seth Beausang (USAO - Delaware), Larry Kutys (USAO - Delaware), Brian Rudolph (FDA/OCI - Maryland), Carlotta Hivoral (CA AG), Mimi Hunley (LA AG), Ben Whitehouse (TN AG), and Mike Rodela (TX AG).

Government may intervene or bring a related action based on the facts underlying the pending action."[26] This first-to-file bar turns on whether the later-filed complaint alleges the same essential facts. In addition, in first-to-file cases for claims a relator pleads insufficiently under Rule 9(b), a second relator may become the first-to-file.[27]

**A.    De Souza meets the standards to obtain first-to-file status.**

De Souza is the first-to-file because, unlike Foote, she pleaded the essential elements of her claim. Nor can Foote be first-to-file because his complaint fails to sufficiently plead his fraud allegations as required by Rule 9(b).

**1.    Determination of first-to-file status is based on whether the later-filed action alleges the same essential elements of the fraud.**

Section 3730(b)(5)'s first-to-file bar "should be determined under an 'essential facts' or 'material elements' standard." This standard requires a determination of "whether the later-filed action alleges the same material or essential elements of fraud described in the pending action."[28] If the later-filed

---

[26] 31 U.S.C. § 3730(b)(5).

[27] *See U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 517-18 (6th Cir. 2009).

[28] *See U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 377-78 (5th Cir. 2009); *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs.*, 149 F.3d 227, 232-33 (3d Cir. 1998); *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 971 (6th Cir. 2005); *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001); *U.S. ex rel. Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1279 (10th Cir. 2004); *U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 32 (1st Cir. 2009), *cert. denied*, No. 09-654, 2010 WL 2471083 (June 21, 2010); *U.S. ex rel. Cooper v. Blue Cross and Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994); *U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217 (D.C. Cir. 2003).

9

complaint alleges the same essential facts previously alleged in the first-filed complaint, then the later-filed claim is barred.[29] To overcome the first-to-file bar, the later-filed complaint must allege different or additional essential facts as opposed to merely incorporating somewhat different details.[30]

### 2. A claim-by-claim analysis shows De Souza was first-to-file.

To determine whether the first-to-file bar applies in a multi-count complaint, the Court must conduct a claim-by-claim analysis.[31] "Claim" refers to a particular count or actionable conduct in a complaint.[32] The language of § 3730(b)(1) indicates that Congress intended that *qui tam* actions be analyzed by reference to each separate "violation of section 3729" for each separate cause of action.[33]

As the chart below illustrates, De Souza pleaded the essential facts of the JUPITER Scheme under Rule 9(b), whereas Foote did not plead the JUPITER Scheme sufficiently, if at all, until March 31, 2010, when he added Lorden in the Foote/Lorden Complaint.[34]

---

[29] *See LaCorte*, 149 F.3d at 232-33.

[30] *See id.*

[31] *U.S. ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 102 (3d Cir. 2000); *U.S. ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*, No. 5:00CV-39-M, 2004 WL 2403114, at *6 (W.D. Ky. Sept. 30, 2004); *LaCorte*, 149 F.3d at 234-35.

[32] *Tillson*, 2004 WL 2403114, at *6 (comparing the various counts in the complaint, including Count 1, which alleged a "false and fraudulent billing scheme").

[33] 31 U.S.C. § 3730(b)(1).

[34] *See In re Natural Gas Royalties Qui Tam Litig. (CO2 Appeals)*, 566 F.3d 956, 964 (10th Cir. 2009) ("The first-to-file bar is designed to be quickly and easily determinable, simply requiring a side-by-side comparison of the complaints."); *LaCorte*, 149 F.3d at 234 n.6 ("[W]e may decide whether the later complaints allege the same material elements as claims in the original lawsuits simply by comparing the original and later complaints.").

This chart demonstrates the differences in each complaint. The notations in red represent the JUPITER Scheme's essential facts which De Souza pleads but Foote does not.

| FOOTE COMPLAINT | DE SOUZA COMPLAINT | FOOTE/LORDEN COMPLAINT |
|---|---|---|
| Feb. 5, 2010 | Feb. 15, 26, 2010 | Mar. 31, 2010 |
| **Foote**<br>■ fired in Oct. 2009<br>■ filed alone initially | **De Souza**<br>■ fired Feb. 2, 2010<br>■ only relator | **Lorden**<br>■ fired in Feb. 2010<br>■ added relator for JUPITER |
| **JUPITER facts (pp.51-53):**<br>■ Mar. 2008, AstraZeneca halted JUPITER because results showed Crestor reduces heart attacks and strokes (p.51) | **JUPITER facts (pp.16-22):**<br>■ Nov. 8-11, 2008, JUPITER study results announced at AHA New Orleans Conference (p.16)<br>■ JUPITER results: Crestor reduces **mortality** AND heart attacks and strokes (pp.16-17) | **JUPITER facts added after De Souza's Complaint:**<br>■ Nov. 9, 2008, JUPITER results presented at AHA Annual Scientific Sessions (p.60) |
| Off-Label Marketing:<br>■ AstraZeneca promoted Crestor for these two indications (pp. 51-52):<br> o Mid-2008, PSS presentation on Crestor superior to Lipitor<br> o Early 2009, speaker presentation<br> o July 15, 2009, DSM e-mail<br>■ Feb. 4, 2010, Internal message from AstraZeneca U.S. Pres., Richard Fante regarding inappropriate references to JUPITER; company to take remedial action (p.52) | Off-Label Marketing:<br>■ Internal briefing on JUPITER sent to sales reps to prepare them for Nov. 10th teleconference; encouraged reps to promote JUPITER; emphasized Crestor could reduce mortality (Ex. 4)<br>■ Nov. 10, 2008, AstraZeneca held nationwide, 2-hr. mandatory teleconference to train sales reps on JUPITER results (p.17)<br>■ Purple and yellow envelopes rush-delivered to reps (p.17)<br> o Purple envelope = Summary (Ex. 2);<br> o Yellow envelope = Reprint (Ex. 3)<br>■ AstraZeneca instructed | Off-Label Marketing:<br>■ Following Monday, 2-hr region-wide sales teleconferences telling reps they would receive purple and gold envelopes (p.60)<br>■ Purple and gold envelopes were delivered to be used by reps actively distribute to target doctors (p. 60)<br>■ Lorden's call notes mention JUPITER (p. 61)<br>■ Off-label promotion continued well into July 2009 (pp.61-62)<br>■ Mar. 10, 2010, "Ask Mike Town Hall" teleconference; moderated by VP of Sales, Mike Tilton, who reminded sales reps to not talk outside a drug's label |

| FOOTE COMPLAINT | DE SOUZA COMPLAINT | FOOTE/LORDEN COMPLAINT |
|---|---|---|
| | sales reps to actively distribute envelopes to certain top-prescribing doctors (e.g., primary care physicians, internists, cardiologists, endocrinologists) from Nov. 2008 - Feb. 2009, foreseeably longer (p.17)<br>■ **Used JUPITER to market Crestor as drug that reduces:**<br>  ○ **mortality**—off label; never approved<br>  ○ heart attacks and strokes—off-label at the time, but later approved. (pp.17-18)<br>Kickbacks:<br>■ Speaker programs: AstraZeneca paid speakers to discuss JUPITER and promote Crestor's off-label uses;<br>■ AstraZeneca sought "coachable" speakers and trained them to say scripted message;<br>■ Honoraria given to speakers that exceeded fair market value;<br>■ Speakers chosen as a reward for prescribing Crestor (pp.21-22)<br>Spoliation & Cover-Up:<br>■ Jan. 27, 2009, Internal Field Guidance briefing sent instructing sales reps to destroy yellow envelopes (Ex. 6)<br>■ Feb. 18, 2009, DSM , Eric Reyes, sent e-mail instructing sales reps to destroy yellow envelopes | (p.63) |

| FOOTE COMPLAINT | DE SOUZA COMPLAINT | FOOTE/LORDEN COMPLAINT |
|---|---|---|
| | with reprint ; confirm that all reprints destroyed (Ex. 5)<br>■ Oct. 26 & 27, 2009, Investigation/meeting by AstraZeneca legal counsel regarding JUPITER in De Souza's call notes (pp.19-20)<br>■ Feb. 2, 2010, e-mail from AstraZeneca's "U.S. Corporate Communications" stating that internal review uncovered inappropriate references to JUPITER and remedial action to be taken (p.21, Ex. 7)<br>■ 100 reps terminated; 400 reps reprimanded (p.21) | |

Thus, as this chart visually demonstrates, Foote failed to allege the essential elements found in the De Souza Complaint.

**3.   Case authority supports the application of this standard to find that De Souza was first-to-file.**

In *United States ex rel. Duxbury v. Ortho Biotech Products, L.P.*, the First Circuit compared complaints and applied the "essential facts" standard adopted by the Fifth Circuit.[35] The facts are similar to those here, including the addition of a second relator by the party who filed first chronologically. In *Duxbury*, relator Duxbury filed a complaint, and one month later, another relator, Blair, filed a

---

[35] *Duxbury*, 579 F.3d at 32-33; *see Branch Consultants*, 560 F.3d at 377-78.

complaint. A year later, Duxbury added a second relator, McClellan, in an amended complaint. The court later dismissed Duxbury's amended complaint because McClellan only added facts to existing allegations.[36] Although similarities existed between their complaints, they differed significantly in that Duxbury alleged only one off-label promotion method (a phony drug study), which did not encompass the essential facts of the widespread off-label promotion scheme alleged in the later-filed Blair complaint (six methods of off-label promotion).[37] Thus, the court held that Duxbury's original complaint did not trump Blair's later-filed complaint under the first-to-file rule.[38]

In *United States ex rel. Westmoreland v. Amgen, Inc.*, the court held that the general allegations in a first-filed complaint did "not encompass the detailed methodology and widespread scheme of overfill marketing" pleaded in a later-filed complaint.[39] Although the first-filed complaint alleged that providers billed free samples to the government, it did not allege the fraudulent scheme's essential facts.[40] The first-to-file rule did not bar the later-filed complaint because it was

---

[36] *Id.* at 28-29.

[37] *Id.* at 32-33 (listing the six off-label promotion methods: (1) marketing off-label to doctors directly; (2) influencing the results of clinical studies; (3) illegally paying doctors "educational grants" and "clerkships;" (4) paying doctors for giving presentations on increasing the drug's dosage; or (5) paying doctors for attending sponsored conferences pushing increased dosages of the drug; and (6) offering rebate programs offered to induce increased prescriptions of the drug).
[38] *Id.*

[39] *U.S. ex rel. Westmoreland v. Amgen, Inc.*, No. 06-10972, 2010 WL 1634315 (D. Mass. Apr. 23, 2010).

[40] *Id.* (listing the essential facts).

"not only the first to plead a widespread promotion scheme of encouraging and teaching providers to bill for overfill, but the first to allege a new methodology of inducing providers with free samples in the form of overfill."[41]

Similarly, here not only is De Souza the first to plead the JUPITER Scheme's essential facts such as the envelopes as an off-label promotion method, but she is the only relator to plead reducing mortality as an off-label indication and catalyst for the JUPITER Scheme.

In *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, another recent, analogous case from the District Court of Massachusetts, the court compared two complaints alleging false claims arising out of a nationwide scheme to increase the use of defendant's medical devices in spinal surgeries through consulting agreements.[42] The court found that the first-filed complaint "made only passing 'information and belief' reference to false claims arising out of illegal kickbacks beyond Arkansas. Moreover, it alleged a consulting agreement with only one doctor." The later-filed complaint alleged "research engagements, VIP travel, stock payments and royalties involving at least ninety-one doctors" which were more than simply 'details,' but essential elements of a *nationwide fraudulent*

---

[41] *Id.*

[42] *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, No. 06-11771, 2010 WL 938361, at *1 (D. Mass. Mar. 12, 2010).

15

*scheme.*"[43]   Similarly, De Souza alleged the yellow and purple envelopes, the

reducing mortality indication, kickbacks, and the cover-up, which are essential

facts, not mere details, of the JUPITER Scheme.   In contrast to the Foote

Complaint, which contains scant allegations reaching beyond the state of Indiana,

De Souza pleads a corporate-wide and nationwide scheme.

**B.    Foote's complaint fails to meet the pleading requirements of Rule 9(b).**

First-to-file questions also have been determined by application of the

pleading standards of Rule 9(b),[44] which requires that "[i]n all averments of fraud

or mistake, the circumstances constituting fraud or mistake shall be stated with

particularity."[45] A first-filed complaint is first only with regard to claims that

satisfy Rule 9(b)'s pleading requirements because only then does the government

have notice of the fraudulent scheme's essential facts necessary to prosecute a

successful *qui tam.*[46]   Rule 9(b) limits the preclusive effect of the chronologically

first-filed complaint to claims that can be pleaded with particularity.   This

requirement limits the danger of opportunistic relators filing unsupported

---

[43] *Id.* (emphasis in original).

[44] *See Poteet*, 552 F.3d at 517-18; *Walburn*, 431 F.3d at 972; *see also* Ex. C, Statement of Interest by the United States at 4, *In re Kaplan Higher Educ. Corp. Qui Tam Litig.*, No. 09-02057-PAS (S.D. Fla. July 6, 2010).

[45] Fed. R. Civ. P. 9(b); *see U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (emphasizing the importance of pleading all the details of the underlying scheme).

[46] *See Walburn*, 431 F.3d at 973 ("A complaint that fails to provide adequate notice to a defendant can hardly be said to have given the government notice of the essential facts of a fraudulent scheme, and therefore would not enable the government to uncover related frauds."); *see also* Ex. C, Statement of Interest by the United States at 4, *In re Kaplan Higher Educ. Corp. Qui Tam Litig.*

16

placeholder complaints for the sole purpose of preemption.[47]

Thus, not only does the Foote Complaint fail to plead the essential facts of the JUPITER Scheme, it does not meet the requirements of Rule 9(b). The Foote/Lorden Complaint, filed on March 31, 2010, demonstrates that Foote knew he needed to plead the JUPITER Scheme more thoroughly to satisfy Rule 9(b).[48] Indeed, the Foote/Lorden Complaint pleads almost all of the JUPITER Scheme's facts De Souza pleads, including AstraZeneca's use of envelopes and Lorden's use of JUPITER in his call notes.[49] Lorden, like De Souza, lost his job when AstraZeneca tried to cover up the JUPITER Scheme.[50] But even using Lorden's knowledge, the Foote/Lorden Complaint fails to plead that AstraZeneca marketed Crestor for the off-label indication of reducing mortality—only De Souza pleads this essential fact.

In *Walburn v. Lockheed Martin Corp.*, the Sixth Circuit compared two competing complaints and concluded that because the first-filed complaint made fatally broad allegations that did not meet Rule 9(b)'s standard, it did not preempt the later-filed complaint.[51] The court concluded as such despite the fact that the first-filed, broad complaint encompassed the specific allegations of fraud made by

---

[47] *U.S. ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 13 (D.D.C. 2003) (emphasis added) (citing *LaCorte*, 149 F.3d at 234).

[48] The only conceivable reason that Foote added Lorden was to plead the JUPITER Scheme.

[49] *See* Foote/Lorden Compl. at 58-63.

[50] *See* Foote/Lorden Compl. at 8.

[51] *Walburn*, 431 F.3d at 972.

the later-filed complaint.[52]  To satisfy Rule 9(b), the plaintiff must allege, the fraudulent scheme.[53]  And Walburn's later-filed complaint could not be "based on the facts underlying" the *Brooks* first-filed complaint because the first-filed complaint lacked "the facts necessary to put the government on notice of the fraud alleged."[54]  Similarly, De Souza's action could not possibly be "based on the facts underlying" the Foote Complaint as the facts necessary to put the government on notice of the JUPITER Scheme—particularly the envelopes, the mortality indication, and the cover-up—are not in the Foote Complaint.[55]

In first-to-file cases, Rule 9(b) ensures that the government has notice of the fraudulent scheme and prevents opportunistic plaintiffs like Foote from filing unsupported complaints to act as placeholders for others like Lorden.[56]  Because a defendant may file a motion to dismiss a first-filed complaint under Rule 9(b), allowing a fatally broad complaint to preempt a properly pled, later-filed complaint would not further the FCA's purpose.[57]  In this case, allowing the Foote Complaint to bar the De Souza Complaint would hinder the government's ability to recover

---

[52] *Id.* at 973.

[53] *Id.* at 972 (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)).

[54] *Id.* at 973.

[55] *See* Ex. D, Statement of Interest by the United States at 3-4, *U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.*, No. 07-2009-ESH (D.D.C. May 24, 2010) (stating that notice of fraud in a contract with one agency is not notice as to similar fraud in other contracts with different agencies).

[56] *See Ortega*, 240 F. Supp. 2d at 13.

[57] *See id.*; *see also Poteet*, 552 F.3d at 517-18.

18

funds AstraZeneca fraudulently obtained through the JUPITER Scheme because the government would not have proper notice of the entire scheme.

**C.    This Court has authority to determine first-to-file status now.**

De Souza asks this Court exercise its broad discretion and authority to decide this issue now. This Court has the authority to decide this motion under 28 U.S.C. § 1331 and the *qui tam* provisions of the FCA.[58]

Failure of the Court to act means that the relator and her counsel, without any assurance that De Souza would be ultimately considered first-to-file, would be required to continue to spend considerable time and resources being interviewed and finding documents and be subjected to the emotional toll that an action such as this takes on an individual.

*Qui tam* cases take years to resolve. During the seal phase, time and expenses can exceed one million dollars. De Souza and her counsel would have to spend significant time reviewing and analyzing documents, locating and interviewing witnesses, and developing liability facts. As a practical matter, De Souza and her counsel cannot continue with this case, provide information to the government, and analyze information without a determination that De Souza has first-to-file status.

---

[58] 31 U.S.C. §§ 3729–3733; *see Hutcheson*, 2010 WL 938361, at *1 (deciding the first-to-file issue even though the earlier-filed, competing complaint was filed in another jurisdiction).

## IV. Conclusion

For these reasons, De Souza respectfully requests that this Court hold that

De Souza is the first-to-file on the JUPITER Scheme.

Respectfully submitted,

Joel M. Androphy
State Bar No. 01254700
S.D. Tex. 53457
Kathryn E. Nelson
State Bar No. 24037166
S.D. Tex. Bar No. 36108
Ashley Gargour
State Bar No. 24065272
S.D. Tex. 1040478
Berg & Androphy
3704 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785
Email: jandrophy@bafirm.com
Email: knelson@bafirm.com
Email: agargour@bafirm.com

Lynne Liberato
State Bar No. 00000075
S.D. Tex. 3072
Haynes and Boone, LLP
1221 McKinney, Suite 2100
Houston, TX 77010
Telephone (713) 547-2017
Facsimile (713) 236-5538
Email: lynne.liberato@haynesboone.com

**ATTORNEYS FOR RELATOR
ROSEMARIE DE SOUZA**

20

## CERTIFICATE OF CONFERENCE

Relator's counsel has contacted W. Scott Simmer at the law firm Blank Rome LLP, counsel for Foote and Lorden, regarding the Motion, but counsel is unable to reach a resolution over the last two weeks. The Government takes no position on the issues in the Motion.

_____

Joel M. Androphy

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was forwarded via the United States Mail, certified, return receipt requested, by facsimile, or by messenger to W. Scott Simmer at Blank Rome LLP, the United States Attorney's Office in the Southern District of Texas, and the Department of Justice in Washington, D.C., and the Attorneys General of the *Qui Tam* States and the District of Columbia on October 1, 2010.

_____

Joel M. Androphy

Sealed
Public and unofficial staff access to this instrument are prohibited by court order.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *ex rel.* RoseMarie De Souza | § | CIVIL ACTION NO. 10-465 |
| and RoseMarie De Souza | § | |
| individually, et al. | § | |
| Plaintiffs, | § | FILED UNDER SEAL |
| | § | |
| v. | § | |
| | § | |
| ASTRAZENECA PLC, | § | |
| ASTRAZENECA | § | |
| PHARMACEUTICALS, LP, | § | |
| Defendants. | § | |

**ORDER GRANTING RELATOR ROSEMARIE DE SOUZA'S OPPOSED MOTION TO DETERMINE FIRST-TO-FILE STATUS**

Relator RoseMarie De Souza filed her Opposed Motion to Determine First-to-File Status ("Motion"). After reviewing the Motion, the Court concludes that De Souza is the first-to-file on the JUPITER Scheme. Accordingly, the Motion should be granted. It is therefore:

ORDERED, ADJUDGED, AND DECREED that the Motion is GRANTED; and it is further

ORDERED, ADJUDGED, AND DECREED that RoseMarie De Souza is the first-to-file on the JUPITER Scheme; and it is further

ORDERED, ADJUDGED, AND DECREED that Layne Foote and Mark

Lorden shall not be entitled to any share of the government's recovery under the

JUPITER Scheme.

Signed on _____, 2010.

THE HONORABLE DAVID HITTNER
UNITED STATES DISTRICT JUDGE

2