IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ROSEMARIE DE SOUZA, et al.<br>    *Plaintiffs*,<br><br>        v.<br><br>ASTRAZENECA PLC,<br>ASTRAZENECA PHARMACEUTICALS, LP,<br>    *Defendants*. | C.A. No. 12-cv-756 (SLR) |

**RELATOR ROSEMARIE DE SOUZA'S RESPONSE TO DEFENDANTS'**
**<u>MOTION TO DISMISS ON FIRST-TO-FILE GROUNDS</u>**

Joel Friedlander (Bar No. 3163)
Christopher M. Foulds (Bar No. 5169)
FRIEDLANDER & GORRIS, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE  19801
(302) 573-3500
jfriedlander@friedlandergorris.com
cfoulds@friedlandergorris.com

OF COUNSEL:

Joel M. Androphy, Esquire
Sarah M. Frazier, Esquire
BERG & ANDROPHY
3704 Travis Street
Houston, TX 77002
(713) 529-5622
jandrophy@bafirm.com
sfrazier@bafirm.com

*Attorneys for Relator RoseMarie De Souza*

DATED:  July 28, 2014

## TABLE OF CONTENTS

I.      STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS..................1

II.     SUMMARY OF ARGUMENT .........................................................................................1

III.    STATEMENT OF FACTS...............................................................................................2

        A.      De Souza pleads the essential facts in her complaint ...............................................3

        B.      Foote's complaint fails to plead JUPITER Scheme's essential facts .....................6

IV.     ARGUMENT ....................................................................................................................7

        A.      De Souza meets the standards to obtain first-to-file status because only she
                pleaded the essential elements of the JUPITER scheme .........................................8

                (1)  Determination of first-to-file status is based on whether the
                     later-filed action alleges the same essential elements of the fraud....................8

                (2)  A claim-by-claim analysis shows De Souza was first to file............................8

                (3)  Case authority supports the application of this standard to find
                     that De Souza was first to file .........................................................................10

        B.      Foote's complaint fails to meet the pleading requirements of Rule 9(b)...............13

        C.      De Souza's state law claims are first under the states' equivalent
                first-to-file laws ...................................................................................................18

V.      CONCLUSION................................................................................................................19

# TABLE OF AUTHORITIES

CASES

*Foglia v. Renal Ventures Mgmt., LLC,*
  No. 12-4050, 2014 WL 2535339 (3d Cir. June 6, 2014) ........................................................ 14

*In re Natural Gas Royalties Qui Tam Litig. (CO2 Appeals),*
  566 F.3d 956 (10th Cir. 2009) .................................................................................................. 9

*Palladino ex rel. U.S. v. VNA of S. New Jersey, Inc.,*
  68 F. Supp. 2d 455 (D.N.J. 1999) .......................................................................................... 11

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
  342 F.3d 634 (6th Cir. 2003) .................................................................................................. 18

*U.S. ex rel. Branch Consultants v. Allstate Ins. Co.,*
  560 F.3d 371 (5th Cir. 2009) .............................................................................................. 8, 11

*U.S. ex rel. Cooper v. Blue Cross and Blue Shield of Fla., Inc.,*
  19 F.3d 562 (11th Cir. 1994) ................................................................................................... 8

*U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.,*
  579 F.3d 13(1st Cir. 2009) .......................................................................................... 8, 11, 12

*U.S. ex rel. Galmines v. Novartis Pharm. Corp.,*
  No. 06-3213, 2013 WL 2649704 (E.D. Pa. June 13, 2013) ................................................... 14

*U.S. ex rel. Grubbs v. Kanneganti,*
  565 F.3d 180 (5th Cir. 2009) .............................................................................................. 14, 15

*U.S. ex rel. Grynberg v. Koch Gateway Pipeline Co.,*
  390 F.3d 1276 (10th Cir. 2004) ............................................................................................... 8

*U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.,*
  318 F.3d 214 (D.C. Cir. 2003) ................................................................................................. 8

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.,*
  694 F. Supp. 2d 48 (D. Mass. 2010) ....................................................................................... 13

*U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs.,*
  149 F.3d 227 (3d Cir. 1998) ................................................................................. 8, 9, 10, 11, 15

*U.S. ex rel. Lujan v. Hughes Aircraft Co.,*
  243 F.3d 1181 (9th Cir. 2001) ................................................................................................. 8

{FG-W0375003.2}

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*,
570 F.3d 849 (7th Cir. 2009) ................................................................... 15

*U.S. ex rel. Merena v. SmithKline Beecham Corp.*,
205 F.3d 97 (3d Cir. 2000) .............................................................. 8, 10

*U.S. ex rel. Ortega v. Columbia Healthcare, Inc.*,
240 F. Supp. 2d 8 (D.D.C. 2003) .......................................................... 15, 18

*U.S. ex rel. Piacentile v. Sanofi Synthelabo, Inc.*,
No. 05-2927, 2010 WL 5466043 (D.N.J. Dec. 30, 2010) ........................... 10

*U.S. ex rel. Poteet v. Medtronic, Inc.*,
552 F.3d 503 (6th Cir. 2009) ....................................................... 8, 14, 18

*U.S. ex rel. Ruscher v. Omnicare*,
No. 08-3396, 2014 WL 2618158 (S.D. Tex. June 12, 2014) ........................ 9

*U.S. ex rel. Taylor v. Gabelli*,
345 F. Supp. 2d 313 (S.D.N.Y. 2004) ....................................................... 9

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
125 F.3d 899 (5th Cir. 1997) ................................................................... 15

*U.S. ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*,
No. 5:00CV-39-M, 2004 WL 2403114 (W.D. Ky. Sept. 30, 2004) ............... 8

*U.S. ex rel. Urbanek v. Lab. Corp. of Am. Holdings, Inc.*,
No. 00-CV-4863, 2003 WL 22795324 (E.D. Pa. Nov. 21, 2003) ................ 11

*U.S. ex rel. Westmoreland v. Amgen, Inc.*,
707 F. Supp. 2d 123 (D. Mass. 2010) .............................................. 12, 20

*United States v. Q Int'l Courier, Inc.*,
131 F.3d 770 (8th Cir. 1997) ................................................................... 9

*Walburn v. Lockheed Martin Corp.*,
431 F.3d 966 (6th Cir. 2005) ........................................ 8, 14, 15, 17, 18

STATUTES

21 U.S.C. § 331 ..................................................................................... 3

21 U.S.C. § 352(f) ................................................................................. 3

31 U.S.C. § 3730(b)(1) ........................................................................ 8

iv

31 U.S.C. § 3730(b)(5) ................................................................................................ 1, 7, 8

31 U.S.C. § 3731(a)(7)..................................................................................................... 9

42 U.S.C. § 1320a-7b(b) ................................................................................................. 5

La. Rev. Stat. Ann. § 46:439.2(A)(3) (2011) ............................................................... 19

La. Rev. Stat. Ann. § 46:439.2(A)(3)(b) (2010) .......................................................... 19

RULES

Federal Rule of Civil Procedure 9(b)............................................. 1, 2, 7, 8, 10, 13, 14, 15, 17, 18

REGULATIONS

21 C.F.R. § 310.3(h)(4) & (5).......................................................................................... 3

65 Fed. Reg. 14286 ......................................................................................................... 3

## I.        STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Relator RoseMarie De Souza filed her *qui tam* action against Defendants AstraZeneca PLC and AstraZeneca Pharmaceuticals, LP (collectively, "Defendants" or "AstraZeneca").  De Souza files this Response to Defendants' Motion to Dismiss on First-to-File Grounds and Brief in Support, D.I. 83 and 84 ("Motion to Dismiss"), and in support states as follows.

## II.        SUMMARY OF ARGUMENT

1.        De Souza is the first to file this *qui tam* action challenging the JUPITER[1] Scheme—AstraZeneca's nationwide, off-label marketing scheme to promote Crestor for reducing heart attacks, strokes, and mortality.  The JUPITER Scheme is based on the results of the JUPITER study—one of many studies AstraZeneca used to promote Crestor.  Layne Foote, another relator, has filed a competing *qui tam* complaint.  *See United States ex rel. Foote v. AstraZeneca LP*, No. 10-00095-SLR (D. Del.) ("Foote Complaint").  Although Foote filed his original complaint ten days before De Souza filed her original complaint,[2] Foote is not the first to file on the JUPITER Scheme.  This is because (1) De Souza pleaded all the essential elements of the JUPITER Scheme, including the most essential element: AstraZeneca promoted Crestor for reducing all-cause mortality;[3] and (2) De Souza pleaded the JUPITER Scheme sufficiently under Federal Rule of Civil Procedure 9(b).  Thus, De Souza asks this Court to hold that De Souza is the first to file on the JUPITER Scheme.

2.        The first-to-file rule in 31 U.S.C. § 3730(b)(5) bars a later-filed complaint only if it alleges the same essential facts contained in a previously filed complaint.  Foote fails to allege

---

[1] JUPITER is an acronym for Justification for the Use of Statins in Prevention: An Intervention Trial Evaluating Rosuvastatin.

[2] On February 15, 2010, De Souza filed her original *qui tam* complaint, and on February 26, 2010, she filed an amended complaint to make non-material modifications ("De Souza Complaint").  All page citations throughout this Response refer to De Souza's First Amended Complaint, D.I. 4.

[3] *See* De Souza Compl., Ex. 3, JUPITER Study Reprint.

the JUPITER Scheme's essential facts, including essential facts about its method of off-label promotion. Most importantly, Foote never pleaded that AstraZeneca promoted Crestor as a drug that reduced mortality—the off-label indication that was the catalyst for the JUPITER Scheme.

3.      In addition, he also fails to sufficiently plead the JUPITER Scheme. Rule 9(b) requires allegations of fraud to be stated with particularity. To be considered first-filed, a complaint must be sufficient under Rule 9(b). Foote filed a deficient, placeholder complaint that prevents him from being considered the first to file.

4.      Allowing a relator such as Foote to act as placeholder contravenes the policy behind the False Claims Act ("FCA"). De Souza, not Foote, has all the essential information about the scheme necessary to equip the government to successfully prosecute the *qui tam* action.

### III.   STATEMENT OF FACTS

Crestor entered the market in 2003, well behind other statins with well-established markets, such as Lipitor.[4] AstraZeneca, recognizing the need to differentiate Crestor from its precursors, published a series of studies of variable quality over the next several years.[5] Layne Foote's Original Complaint lays out facts concerning several of these earlier studies. Both Foote's and De Souza's original complaints describe the ASTEROID study, which was published in 2006. Immediately following that study was the JUPITER study, which launched a unique campaign by AstraZeneca to attempt to find a basis for asserting that Crestor yielded superior "outcomes" for patients compared with its competitors and then market that assertion regardless of whether it was scientifically sound or supported by Crestor's FDA-approved label. Because AstraZeneca's claims regarding Crestor concerning supposed superior outcomes were

---

[4] *See* De Souza Compl. ¶¶ 38-39.
[5] *See* De Souza Compl. ¶¶ 40-41.

not scientifically supported by Crestor's label at that time (and they still are unsupported), they constituted false or fraudulent "off-label marketing," which is illegal under the Federal Food Drug and Cosmetic Act ("FDCA").[6]   The scheme began when AstraZeneca announced the results of its JUPITER study and began marketing Crestor as a drug that could reduce mortality in certain patients.  It culminated with De Souza filing this lawsuit, having been fired after doing exactly what AstraZeneca told her to do.

Just after De Souza's termination, Foote, an employee who was fired before the JUPITER Scheme ended for reasons not related to the scheme, filed his suit.  Because he lacked personal knowledge regarding the JUPITER scheme, as to that scheme, his complaint amounted to nothing more than a placeholder suit that failed to allege the essential facts necessary to support a claim based on the JUPITER Scheme.

In fact, the sparcity of Foote's allegations regarding JUPITER became all the more apparent when he later joined with another former AstraZeneca employee in March, 2010 to amend his complaint and add the kinds of allegations that De Souza had already offered.

**A.      De Souza pleads the essential facts in her complaint.**

The following are the essential facts of the JUPITER Scheme as pled in De Souza's Original Complaint.

At the American Heart Association conference in New Orleans in 2008, AstraZeneca announced the results of a study that supposedly showed that Crestor reduces certain patients' risk of heart attacks, strokes, and mortality.[7]  What distinguishes the JUPITER study from all the other Crestor studies is that it touted Crestor as a drug that could reduce mortality from any cause, not just prevent cardiovascular related events or strokes—a bold assertion indeed, and one

---

[6] *See* 21 U.S.C. §§ 331, 352(f); 21 C.F.R. § 310.3(h)(4) & (5); 65 Fed. Reg. 14286.
[7] De Souza Compl. at 16-17.

that the Food and Drug Administration (FDA) has never approved because AstraZeneca has never been able to replicate JUPITER's results in a study meeting FDA's criteria for approval.

Immediately after the announcement, AstraZeneca sent an internal briefing on JUPITER to its sales representatives.  In it, AstraZeneca noted Crestor's ability to reduce mortality.[8]  In conjunction with that briefing, AstraZeneca conducted a mandatory, two-hour teleconference on the results of the JUPITER study.[9]  It also rush-delivered to its sales force purple and yellow envelopes.  These envelopes contained the JUPITER study summary, the JUPITER study reprint that had been distributed at the convention, and instructions to actively distribute the envelopes to specified top-prescribing statin doctors.[10]  While federal law allows off-label published studies that are complete and unaltered to be distributed to physicians in non-promotional contexts, study summaries do not fall within this narrow exception.  Moreover, the sales force was instructed to deliver these materials to specific physicians in the midst of their promotional calls and to introduce the JUPITER results regardless of whether physicians asked about them first—a clear violation of law.[11]

Thus, using the information in these envelopes, AstraZeneca marketed Crestor as a drug that reduces total mortality—a result that made the JUPITER Scheme an extraordinary asset to AstraZeneca's bottom line.[12]  In fact, Crestor sales in the United States reached $2.1 billion for 2009.[13]

---

[8] De Souza Compl., Ex. 4.

[9] De Souza Compl. at 17.

[10] De Souza Compl. at 17.  Crestor is a type of statin drug.

[11] *See* De Souza Compl. ¶¶ 40-47.

[12] AstraZeneca also marketed the drug for heart attacks and strokes, which were indications that were off-label then, but later approved.  *See* De Souza Compl. at 17-18.

[13] AstraZeneca Fourth Quarter and Full Year Results 2009, Full Year Product Review Analysis, at p. 17 of 20, *available at* http://www.astrazeneca.com/investors/financial-results/ (follow "2009" hyperlink; then follow "Figures (PDF 228 kb)" hyperlink).

Further, AstraZeneca also promoted Crestor by paying "coachable" speakers to deliver a scripted message on the JUPITER results and Crestor's off-label uses.  It often selected doctors as speakers to reward them for being high-prescribers and paid them above-market honoraria.[14]

To cover-up its conduct, AstraZeneca later ordered its sales representatives to destroy the purple and yellow envelopes.[15]  De Souza's District Sales Manager, Eric Reyes, sent instructions in an e-mail along with a request to confirm that the sales representatives had complied.[16]  In October 2009, AstraZeneca's legal counsel investigated De Souza's call notes for JUPITER-related issues.[17] Then, on February 2, 2010, AstraZeneca sent an e-mail to De Souza stating that an internal review uncovered inappropriate references to JUPITER during her sales efforts and that the company was taking remedial action.  Later the same day, AstraZeneca terminated De Souza and nearly 100 other sales representatives to cover up the off-label marketing and kickbacks in the JUPITER Scheme.[18]

In sum, the De Souza Complaint pleads the JUPITER Scheme sufficiently by detailing the essential facts of the JUPITER Scheme, including: (1) the study results announced at the New Orleans conference; (2) the JUPITER study results showing that Crestor reduces heart attacks, strokes, and *mortality*—JUPITER's central finding;[19] (3) internal briefing mentioning the mortality indication; (4) the mandatory, nationwide teleconference; (5) the rush-delivery of purple and yellow envelopes; (6) AstraZeneca's instructions to distribute the envelopes to the top-prescribing statin doctors; (7) that AstraZeneca marketed Crestor off-label for reducing heart

---

[14] De Souza Compl. at 21-22. The Anti-Kickback Statute makes it illegal for an individual to knowingly and willfully offer or pay remuneration in cash or in kind to induce a physician to order a good or service that is reimbursed by a federal healthcare program. *See* Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

[15] De Souza Compl., Ex. 6.

[16] De Souza Compl., Ex. 5.

[17] De Souza Compl. at 19-21.  Call notes are follow-up notes recorded after a sales representative meets with a doctor who may be a potential customer of AstraZeneca. De Souza Compl. at 19.

[18] De Souza Compl. at 21.

[19] *See* De Souza Compl. at 17. On February 8, 2010, the FDA approved Crestor for reducing heart attacks and strokes but never approved the reduction in mortality indication.

attacks, strokes, *and mortality*; (8) the kickbacks given to speakers; (9) the spoliation of evidence and cover-up; (10) AstraZeneca's legal investigation of JUPITER in De Souza's call notes; and (11) AstraZeneca's nationwide termination and reprimanding of sales representatives.  De Souza also attached to her complaint the envelopes and AstraZeneca's internal briefing materials on the Jupiter Study.[20]

## B.    Foote's complaint fails to plead JUPITER Scheme's essential facts.

Unlike the De Souza Complaint, the Foote Complaint fails to plead the JUPITER Scheme's essential facts.  In fact, Foote could not have been part of the JUPITER Scheme because AstraZeneca fired him in October 2009—several months before the nationwide termination of sales representatives for the JUPITER Scheme.  With limited knowledge, Foote only broadly alleges the JUPITER Scheme by pleading the following facts:[21] (1) in March 2008, AstraZeneca halted JUPITER because the results showed that Crestor reduces heart attacks and strokes; (2) AstraZeneca promoted Crestor for these two indications through a sales representative presentation in mid-2008 and a speaker program in early 2009; (3) on July 15, 2009, District Sales Manager Dick Hodge sent an e-mail to representatives encouraging them to promote JUPITER's results that Crestor reduces heart attacks and strokes; and (4) on February 4, 2010, AstraZeneca's U.S. President, Richard Fante sent an internal message regarding inappropriate references to JUPITER and remedial action.

Importantly, unlike De Souza, Foote fails to allege that AstraZeneca promoted JUPITER Study's landmark result that Crestor could reduce total mortality and not just cardiovascular-related events.  Foote focuses entirely on the JUPITER study's revelation that Crestor prevents heart attacks and strokes and deaths specific to those causes.  But De Souza accurately pleads the

---

[20] *See* De Souza Compl. at 17-18; Ex. 2 (JUPITER Summary in the purple envelope); Ex. 3 (JUPITER Study reprint in the yellow envelope); Ex. 4 (AstraZeneca Internal Briefing on JUPITER Study).
[21] *See* Foote Compl. at 51-53.

6

fact that the JUPITER study emphasized that AstraZeneca used the JUPITER study to promote the reduction in mortality by any cause.[22]  There is no question that there is a significant difference between marketing a drug for preventing cardiovascular mortality (i.e., death by heart attack or stroke) and preventing *total* mortality.  The entire JUPITER Scheme falls apart without this essential element.

Realizing his JUPITER allegations could not withstand a motion to dismiss under Rule 9(b), Foote added an additional relator, Mark Lorden, on March 31, 2010 in an amended complaint ("Foote/Lorden Complaint").  AstraZeneca had fired Lorden as a part of the February 2010 cover-up.  Foote chose to add a second relator and dilute his share of any potential recovery because he knew he needed to plead the JUPITER Scheme more thoroughly to satisfy pleading requirements.  But even with the benefit of Lorden's additional allegations, Foote falls short of pleading, as De Souza does, that AstraZeneca marketed Crestor using the significant result of the JUPITER study—that Crestor reduces mortality.

## IV.    ARGUMENT

When an individual brings a FCA action, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."[23] This first-to-file bar turns on whether the later-filed complaint alleges the same essential facts as to a claim.  In addition, in first-to-file cases for claims a relator pleads insufficiently under Rule 9(b), certain courts have held that a second relator may become the first-to-file.[24]

---

[22] *See* De Souza Compl. ¶¶ 42–43, 45, 47.
[23] 31 U.S.C. § 3730(b)(5).
[24] *See U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 517-18 (6th Cir. 2009).

**A.      De Souza meets the standards to obtain first-to-file status because only she pleaded the essential elements of the JUPITER scheme.**

De Souza is the first to file because, unlike Foote, she pleaded the essential elements of the JUPITER scheme.

**(1)      Determination of first-to-file status is based on whether the later-filed action alleges the same essential elements of the fraud.**

In the Third Circuit, Section 3730(b)(5)'s first-to-file bar should be determined under an "essential facts" or "material elements" standard. Under this standard, courts apply the bar if the "later complaints allege the same material elements as claims in the original lawsuit."[25]  To overcome the first-to-file bar, the later-filed complaint must allege different or additional essential facts as opposed to merely incorporating somewhat different details.[26]

**(2)      A claim-by-claim analysis shows De Souza was first to file.**

To determine whether the first-to-file bar applies in a multi-count complaint, the Court must conduct a claim-by-claim analysis.[27]  "Claim" refers to a particular count or actionable conduct in a complaint.[28]  The language of § 3730(b)(1) indicates that Congress intended that *qui tam* actions be analyzed by reference to each separate "violation of section 3729" for each separate cause of action.[29]  For example, in *LaCorte*, after the court determined that the first-to-

---

[25] *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs.*, 149 F.3d 227, 235 n.6 (3d Cir. 1998).  *See also U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 32 (1st Cir. 2009), *cert. denied*, No. 09-654, 2010 WL 2471083 (June 21, 2010); *U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 377-78 (5th Cir. 2009); *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 971 (6th Cir. 2005); *U.S. ex rel. Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1279 (10th Cir. 2004); *U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217 (D.C. Cir. 2003); *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001); *U.S. ex rel. Cooper v. Blue Cross and Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994).
[26] *See LaCorte*, 149 F.3d at 232-33.
[27] *See U.S. ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 102 (3d Cir. 2000) (Alito, J.) ("[W]hen it is asserted that a later-filed complaint contains claims that are based on the facts underlying certain claims in a pending multi-count complaint, the court must conduct a claim-by-claim analysis in order to determine if section 3730(b)(5) applies."); *LaCorte*, 149 F.3d at 234-36; *see also U.S. ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*, No. 5:00CV-39-M, 2004 WL 2403114, at *6 (W.D. Ky. Sept. 30, 2004).
[28] *Tillson*, 2004 WL 2403114, at *6 (comparing the various counts in the complaint, including Count 1, which alleged a "false and fraudulent billing scheme").
[29] 31 U.S.C. § 3730(b)(1).

file bar applied to one of relator's claims regarding billing, the court did not assume that the bar must also disallow the relator's remaining claims.[30]

De Souza pleaded the essential facts of the JUPITER Scheme, whereas Foote did not plead the JUPITER Scheme sufficiently, if at all, until March 31, 2010, when he added Lorden in the Foote/Lorden Complaint.[31]

With respect to the "Spoliation & Cover-Up" section of the De Souza Complaint,[32] it is worth noting that a claim-by-claim analysis reveals that only De Souza pleaded a reverse false claim under 31 U.S.C. § 3731(a)(7). A reverse false claim requires more than just the allegation that all along the defendant concealed the fact that it was making false statements to increase the amount of money the Government pays. To sufficiently allege a reverse false claim, the plaintiff must allege that the defendant: (1) made a false statement or created and used a false record; (2) with knowledge of its falsity; (3) for the purpose of decreasing, concealing, or avoiding an obligation to pay the Government.[33] To recover damages for a reverse false claim, the relator must demonstrate that the Government was owed a specific, legal obligation at the time the alleged false record or statement was made.[34] In other words, there must be a defining moment when AstraZeneca knew of its obligation and concealed it. This moment is the time period from January 2009 to February 2010 when AstraZeneca discovered that its sales representatives had call notes containing off-label JUPITER discussions with physicians, instructed sales representatives to destroy the yellow envelopes, terminated 100 representatives, and failed to

---

[30] *See LaCorte*, 149 F.3d at 234-36.

[31] *See In re Natural Gas Royalties Qui Tam Litig. (CO2 Appeals)*, 566 F.3d 956, 964 (10th Cir. 2009) ("The first-to-file bar is designed to be quickly and easily determinable, simply requiring a side-by-side comparison of the complaints."); *LaCorte*, 149 F.3d at 234 n.6 ("[W]e may decide whether the later complaints allege the same material elements as claims in the original lawsuits simply by comparing the original and later complaints.").

[32] *See* De Souza Compl. at 19-21 and Exs., 5, 6, 7.

[33] *See U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 331-32 (S.D.N.Y. 2004); *see also U.S. ex rel. Ruscher v. Omnicare*, No. 08-3396, 2014 WL 2618158, at *27-28 (S.D. Tex. June 12, 2014) (defining reverse false claim).

[34] *See United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997).

9

report the misconduct as required under the Corporate Integrity Agreements.[35]   De Souza devoted an entire section of her complaint to this issue and pleaded the reverse false claim pursuant to Rule 9(b).[36]   Foote failed to plead the reverse false claim and only pleads that AstraZeneca concealed its off-label promotional activities.   In sum, Foote failed to allege the essential elements found in the De Souza Complaint.

> **(3)   Case authority supports the application of this standard to find that De Souza was first to file.**

In the Third Circuit, courts follow the essential elements test and use a "claim-by-claim" analysis in first-to-file determinations.[37]   As noted above, "claims" refers to separate violations of the FCA or counts in the complaint, not details.

In the Motion to Dismiss, AstraZeneca attempts to blur this distinction and argues that De Souza added details and not new claims.   *See* D.I. 84 at 8.   In *U.S. ex rel. Piacentile v. Sanofi Synthelabo, Inc.*, cited by AstraZeneca, the second-to-file relator argued that he should have first-to-file status because he pleaded details about the doctors and hospitals involved in the scheme, the sales force's "martini budget", and the kickback amounts given to doctors.[38]   The court held that "this information merely 'incorporates somewhat different details' of the scheme and is insufficient to save Piacentile's claims."[39]   Unlike the *Piacentile* complaint, De Souza does not just add mere details like names, budgets, or dollar amounts; De Souza adds a wholly new claim—AztraZeneca marketed Crestor to reduce total mortality.

The other cases cited by AstraZenca are also distinguishable.   In *Urbanek*, the court barred the later-filed complaint because it only added that, for the Stark violation claim,

---

[35] *See* De Souza Compl. ¶¶ 48–55, 86.
[36] De Souza Compl. ¶¶ 48–55, 86.
[37] *See, e.g.*, *Merena*, 205 F.3d at 102 (noting that in first-to-file determinations with multi-count complaints, courts must conduct a claim-by-claim analysis); *LaCorte*, 149 F.3d at 234-36.
[38] No. 05-2927, 2010 WL 5466043, at *6 (D.N.J. Dec. 30, 2010).
[39] *Id.* (citing *LaCorte*, 149 F.3d at 232–33).

{FG-W0375003.2}

defendant provided physicians free medical products not just free computer products as the first-to-file relator pleaded.[40]   Additionally, the later-filed complaint added that the defendant provided "in-house phlebotomists" as opposed to the first relator's allegation that the "defendant provided free services, including services typically provided by phlebotomists."[41]  The court held that these minor details are not enough to overcome the first-to-file bar.[42]

AstraZeneca also cites *LaCorte* but fails to discuss the facts, which make clear that De Souza's complaint is not the type of parasitic complaint that the Third Circuit analyzed in *LaCorte* when developing a standard for first-to-file disputes.  In *LaCorte*, three relators filed three complaints as the original case was settling—a blatantly opportunistic move.[43]  The three later-filed complaints described the same elements of the fraud alleged in original suit but at different regions and offices.[44]  The Third Circuit barred the later-filed complaints because other than pleading different locations, the later-complaints alleged the same essential elements of the fraud.[45]  In *Palladino*, another case cited by AstraZenca, the Court barred the later-filed complaint because, like the complaint in *LaCorte*, it only broadened the location of the fraud.[46]

In *United States ex rel. Duxbury v. Ortho Biotech Products, L.P.*, the First Circuit compared complaints and applied the "essential facts" standard adopted by the Fifth Circuit.[47]  The facts are similar to those here, including the addition of a second relator by the party who filed first chronologically.  In *Duxbury*, relator Duxbury filed a complaint, and one month later, another relator, Blair, filed a complaint.  A year later, Duxbury added a second relator,

---

[40] *U.S. ex rel. Urbanek v. Lab. Corp. of Am. Holdings, Inc.*, No. 00-CV-4863, 2003 WL 22795324, at *3-4 (E.D. Pa. Nov. 21, 2003).
[41] *Id.* at *5-6.
[42] *Id.*
[43] *LaCorte*, 149 F.3d at 231-33.
[44] *Id.*
[45] *Id.*
[46] *Palladino ex rel. U.S. v. VNA of S. New Jersey, Inc.*, 68 F. Supp. 2d 455, 478 (D.N.J. 1999).
[47] *Duxbury*, 579 F.3d at 32-33; *see Branch Consultants*, 560 F.3d at 377-78.

McClellan, in an amended complaint.  The court later dismissed Duxbury's amended complaint because McClellan only added facts to existing allegations.[48]  Although similarities existed between their complaints, they differed significantly in that Duxbury alleged only one off-label promotion method (a phony drug study), which did not encompass the essential facts of the widespread off-label promotion scheme alleged in the later-filed Blair complaint (six methods of off-label promotion).[49]  Thus, the court held that Duxbury's original complaint did not trump Blair's later-filed complaint under the first-to-file rule.[50]

In *United States ex rel. Westmoreland v. Amgen, Inc.*, the court held that the general allegations in a first-filed complaint did "not encompass the detailed methodology and widespread scheme of overfill marketing" pleaded in a later-filed complaint.[51]  Although the first-filed complaint alleged that providers billed free samples to the government, it did not allege the fraudulent scheme's essential facts.[52]  The first-to-file rule did not bar the later-filed complaint because it was "not only the first to plead a widespread promotion scheme of encouraging and teaching providers to bill for overfill, but the first to allege a new methodology of inducing providers with free samples in the form of overfill."[53]

Similarly, not only is De Souza the first to plead the JUPITER Scheme's essential facts such as the envelopes as an off-label promotion method, and indeed they were *the central* off-

---

[48] *Duxbury*, 579 F.3d at 28-29.

[49] *Id*. at 32-33 (listing the six off-label promotion methods: (1) marketing off-label to doctors directly; (2) influencing the results of clinical studies; (3) illegally paying doctors "educational grants" and "clerkships;" (4) paying doctors for giving presentations on increasing the drug's dosage; or (5) paying doctors for attending sponsored conferences pushing increased dosages of the drug; and (6) offering rebate programs offered to induce increased prescriptions of the drug).

[50] *Id*.

[51] 707 F. Supp. 2d 123, 129 (D. Mass. 2010), *aff'd in part and rev'd in part on other grounds*, *New York v. Amgen Inc.*, 652 F.3d 103 (1st Cir. Mass. 2011).

[52] *Id*. 129-30 (listing the essential facts).

[53] *Id*. at 130.

label promotion method for this scheme, but she is the only relator to plead reducing total mortality as an off-label indication and catalyst for the JUPITER Scheme.

In *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, another recent, analogous case from the District Court of Massachusetts, the court compared two complaints alleging false claims arising out of a nationwide scheme to increase the use of defendant's medical devices in spinal surgeries through consulting agreements.[54]   The court found that the first-filed complaint "made only passing 'information and belief' reference to false claims arising out of illegal kickbacks beyond Arkansas.  Moreover, it alleged a consulting agreement with only one doctor." The later-filed complaint alleged "research engagements, VIP travel, stock payments and royalties involving at least ninety-one doctors" which were more than simply 'details,' but essential elements of a *nationwide fraudulent scheme*."[55]   Similarly, De Souza alleged the yellow and purple envelopes, the reducing mortality indication, kickbacks, and the cover-up, which are essential facts, not mere details, of the JUPITER Scheme.  In contrast to the Foote Complaint, which contains scant allegations reaching beyond the state of Indiana, De Souza pleads a corporate-wide and nationwide scheme.  In sum, De Souza adds more than just details, she pleads essential elements not pleaded by Foote.

**B.    Foote's complaint fails to meet the pleading requirements of Rule 9(b).**

Of the various schemes pleaded by both Foote and De Souza, this Court should hold in the alternative that De Souza is the first to file on the JUPITER Scheme because only her allegations satisfy the strictures of Rule 9(b) for this claim.  First-to-file questions have been determined by application of the pleading standards of Rule 9(b),[56] which requires that "[i]n all

---

[54] *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 694 F. Supp. 2d 48, 58-59 (D. Mass. 2010), *rev'd on other grounds*, 647 F.3d 377 (1st Cir. 2011).
[55] *Id*. (emphasis in original).
[56] *See Poteet*, 552 F.3d at 517-18; *Walburn*, 431 F.3d at 972.

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[57]   Additionally, the United States government has stated that courts should consider Rule 9(b) in first-to-file determinations.[58]

In the Motion to Dismiss, AstraZeneca argues that an "earlier-filed complaint need not satisfy the pleading standards of Rule 9(b) in order to bar a later-filed action" so long as the government is equipped to investigate the fraud alleged in the later-filed action.  *See* D.I. 84, at 2. But the *Galmines* case AstraZeneca cites in support of its position is not as dismissive of Rule 9(b)'s application to first-to-file issues as AstraZeneca would lead this Court to believe.   In *Galmines*, the court did not state that Rule 9(b) does not apply; it concluded that under the facts of that case, it need not reach whether the first-filed complaint satisfied Rule 9(b) because the later-filed complaint would have been barred anyway under the "essential elements" test as it only "offered more details" than the earlier-filed complaint.[59]   But here, the Court should apply Rule 9(b) because De Souza pleaded an entirely new claim—AstraZeneca's marketing of Crestor to reduce total mortality.   Foote did not plead this unique claim in his JUPITER Scheme allegations because he knew nothing about this claim and could not have possibly put the government on notice of this claim until adding Lorden as his co-relator after De Souza filed her complaint.

The pleading requirements of Rule 9(b) are sometimes referred to as the "who, what, when, where, and how" of the fraudulent activity.[60]   Although this requires pleading with

---

[57] Fed. R. Civ. P. 9(b); *see Foglia v. Renal Ventures Mgmt., LLC*, No. 12-4050, 2014 WL 2535339, at *2 (3d Cir. June 6, 2014) (citing *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (emphasizing the importance of pleading all the details of the underlying scheme)).
[58] *See also* Ex. A, Statement of Interest by the United States at 4, *In re Kaplan Higher Educ. Corp. Qui Tam Litig.*, No. 09-02057-PAS (S.D. Fla. July 6, 2010) (arguing that when determining first-to-file issues, courts should consider the adequacy of relators' claims under Rule 9(b)).
[59] *U.S. ex rel. Galmines v. Novartis Pharm. Corp.*, No. 06-3213, 2013 WL 2649704, at *10, n.4 (E.D. Pa. June 13, 2013).
[60] *See, e.g., U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).

{FG-W0375003.2}

specificity, Rule 9(b) does not require that a plaintiff plead the level of detail required to prevail at trial.[61]   Pleading the fraudulent scheme paired with the reliable indicia, as opposed to merely pleading the contents of a bill, such as billing numbers, dates, and amounts, is what the plaintiff needs to do to describe the fraud sufficiently, as "it is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills."[62]

A first-filed complaint is first only with regard to claims that satisfy Rule 9(b)'s pleading requirements because only then does the government have notice of the fraudulent scheme's essential facts necessary to prosecute a successful *qui tam* lawsuit.[63]   Rule 9(b) limits the preclusive effect of the chronologically first-filed complaint to claims that can be pleaded with particularity.   This requirement limits the danger of opportunistic relators filing unsupported placeholder complaints for the sole purpose of preemption.[64]

De Souza pleaded the "who, what, when, where, and how" of the JUPITER Scheme.  For the "who" requirement, De Souza pleaded that "its sales representatives nationwide," including the 100 representatives AstraZeneca laid off nationwide, participated in the JUPITER Scheme and the targeted doctors included "primary care physicians, internists, cardiologists, and endocrinologists."[65]   De Souza also pleaded the names of the members of AstraZeneca's management who instructed sales representatives to conceal the scheme.[66]  She also pleaded the

---

[61] *See Grubbs*, 565 F.3d at 189; *see, e.g.*, *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009) (noting that a relator will not be required to plead and produce invoices or other claims documents at the pleading stage).
[62] *Id.* at 189–90.
[63] *See Walburn*, 431 F.3d at 973 ("A complaint that fails to provide adequate notice to a defendant can hardly be said to have given the government notice of the essential facts of a fraudulent scheme, and therefore would not enable the government to uncover related frauds.").
[64] *U.S. ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 13 (D.D.C. 2003) (emphasis added) (citing *LaCorte*, 149 F.3d at 234).
[65] De Souza Compl. ¶¶ 44–45.
[66] De Souza Compl., Ex. 5.

15

names of AstraZeneca's legal counsel who knew about the scheme on October 26, 2009 in the teleconference with De Souza and helped AstraZeneca cover up the scheme by identifying the 100 sales representatives who were later fired on February 2, 2010.[67]

For the "what" requirement, De Souza pleaded that the JUPITER Scheme was the off-label promotion of Crestor for reduction in heart attacks, strokes, and total mortality[68] and that there was a reverse false claim.[69]

For the "when" requirement, De Souza pleaded that the JUPITER Scheme began during the November 8–11, 2008 conference in New Orleans, and that on or about November 12, 2008, AstraZeneca held a nationwide teleconference.[70]   She also pleaded that the JUPITER Scheme lasted from at least November 2008 to February 2009.[71]   De Souza pleaded further that the reverse false claim occurred between October 2009 and February 2010.[72]

For the "where" requirement, De Souza pleaded the location where the JUPITER Scheme began—at the American Heart Association conference in New Orleans, Louisiana.[73]   She also pleaded that AstraZeneca held a "nationwide teleconference," after which envelopes were rush-delivered to all sales representatives nationwide.[74]

Finally, for the "how" requirement, De Souza pleaded that AstraZeneca's methodology for carrying out the JUPITER Scheme was through the use of the purple and yellow envelopes containing the JUPITER reprint and the JUPITER summary that were delivered to targeted doctors.[75]   In *United States ex rel. Westmoreland v. Amgen, Inc.*, the court held a later-filed

---

[67] De Souza Compl. ¶¶ 53–54.
[68] De Souza Compl. ¶¶ 42–43, 45, 47.
[69] De Souza Compl. ¶¶ 48–55, ¶ 86.
[70] De Souza Compl. ¶¶ 42, 44.
[71] De Souza Compl. ¶ 45.
[72] De Souza Compl. ¶¶ 48–55, 86.
[73] De Souza Compl. ¶ 42.
[74] De Souza Compl. ¶ 44.
[75] De Souza Compl. ¶¶ 44–47.

16

relator's claim was not barred by the first-to-file rule because the general allegations in a first-filed complaint did "not encompass the detailed *methodology* and widespread scheme of overfill marketing" pleaded in a later-filed complaint.[76]  It is telling that once Foote added Lorden and amended the Foote Complaint, he added the methodology—i.e., the envelopes.  Foote realized his deficiencies on Rule 9(b) and added Lorden as a second relator.

Thus, not only does the Foote Complaint fail to plead the essential facts of the JUPITER Scheme, it fails to meet the requirements of Rule 9(b).  The Foote/Lorden Complaint, filed on March 31, 2010, demonstrates that Foote knew he needed to plead the JUPITER Scheme more thoroughly to satisfy Rule 9(b).[77]  Indeed, the Foote/Lorden Complaint pleads almost all of the JUPITER Scheme facts De Souza pleads, including AstraZeneca's use of envelopes and Lorden's use of JUPITER in his call notes.[78]  Lorden, like De Souza, lost his job when AstraZeneca tried to cover up the JUPITER Scheme.[79]  But even using Lorden's knowledge, the Foote/Lorden Complaint fails to plead that AstraZeneca marketed Crestor for the off-label indication of reducing mortality—only De Souza pleads this essential fact.

In *Walburn v. Lockheed Martin Corp.*, the Sixth Circuit compared two competing complaints and concluded that because the first-filed complaint made fatally broad allegations that did not meet Rule 9(b)'s standard, it did not preempt the later-filed complaint.[80]  The court concluded as such despite the fact that the first-filed, broad complaint encompassed the specific allegations of fraud made by the later-filed complaint.[81]  It held that to satisfy Rule 9(b), the plaintiff must allege the fraudulent scheme.[82]  Walburn's later-filed complaint could not be

---

[76] 707 F. Supp. 2d at 129 (emphasis added).
[77] The only conceivable reason that Foote added Lorden was to plead the JUPITER Scheme.
[78] *See* Foote/Lorden Compl. at 58-63.
[79] *See* Foote/Lorden Compl. at 8.
[80] *Walburn*, 431 F.3d at 972.
[81] *Id*. at 973.
[82] *Id*. at 972 (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)).

"based on the facts underlying" the first-filed complaint because the first-filed complaint lacked "the facts necessary to put the government on notice of the fraud alleged."[83]  Similarly, De Souza's action could not possibly be "based on the facts underlying" the Foote Complaint as the facts necessary to put the government on notice of the JUPITER Scheme—particularly the envelopes, the mortality indication, and the cover-up—are not in the Foote Complaint.[84]

In first-to-file cases, Rule 9(b) ensures that the government has notice of the fraudulent scheme and prevents opportunistic plaintiffs like Foote from filing unsupported complaints to act as placeholders for others like Lorden.[85]  Because a defendant may file a motion to dismiss a first-filed complaint under Rule 9(b), allowing a fatally broad complaint to preempt a properly pled, later-filed complaint would not further the FCA's purpose.[86]  In this case, allowing the Foote Complaint to bar the De Souza Complaint would hinder the government's ability to recover funds AstraZeneca fraudulently obtained through the JUPITER Scheme because the government would not have proper notice of the entire scheme.  The Court should not reward Foote because his complaint is deficient on the JUPITER Scheme.

## C.    De Souza's state law claims are first under the states' equivalent first-to-file laws.

For all of the reasons that De Souza's federal FCA claims are first, her state law claims are also first under each state's equivalent first-to-file laws.  In particular, De Souza's Louisiana claims survive because Louisiana's first-to-file statute in effect on the date of the filing of both Foote's and De Souza's complaints only dismissed later-filed complaints filed 30 or more days after the first-filed complaint:

---

[83] *Id*. at 973.

[84] *See* Ex. B, Statement of Interest by the United States at 3-4, *U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.*, No. 07-2009-ESH (D.D.C. May 24, 2010) (stating that notice of fraud in a contract with one agency is not notice as to similar fraud in other contracts with different agencies).

[85] *See Ortega*, 240 F. Supp. 2d at 13.

[86] *See id*.; *see also Poteet*, 552 F.3d at 517-18.

> If more than one qui tam action arising out of the same information and allegations is filed, the court shall dismiss all qui tam actions where the complaint and information filed with the secretary or attorney general were filed *thirty days or more after* the first qui tam complaint and information which serves as the basis for the alleged violation were filed with the secretary or attorney general.[87]

Therefore, because De Souza filed her complaint only ten days after Foote, De Souza's claims survive under Louisiana's *qui tam* statute even if the Court concludes that De Souza's Complaint arises out of the same information and allegations as Foote's Complaint (which De Souza does not concede). It was not until 2011 that the 30-day language was removed from the Louisiana *qui tam* statute, which now reads: "When a person brings an action in accordance with this Subpart, no person other than the secretary or attorney general may intervene or bring a related action based on the same facts underlying the pending action."[88]

In sum, De Souza requests that the Court hold that De Souza is first in all states pleaded.

## V.  CONCLUSION

For these reasons, De Souza respectfully requests that this Court deny Defendants' Motion to Dismiss and hold that De Souza is the first to file on the JUPITER Scheme for both state and federal claims.

---

[87] *See* La. Rev. Stat. Ann. § 46:439.2(A)(3)(b) (2010) (emphasis added).
[88] *See* La. Rev. Stat. Ann. § 46:439.2(A)(3) (2011).

{FG-W0375003.2}

FRIEDLANDER & GORRIS, P.A.


/s/ *Joel Friedlander*
Joel Friedlander (Bar No. 3163)
Christopher M. Foulds (Bar No. 5169)
222 Delaware Avenue, Suite 1400
Wilmington, DE  19801
(302) 573-3500
jfriedlander@friedlandergorris.com
cfoulds@friedlandergorris.com

OF COUNSEL:

BERG & ANDROPHY
Joel M. Androphy, Esquire
Sarah M. Frazier, Esquire
3704 Travis Street
Houston, TX 77002
(713) 529-5622
jandrophy@bafirm.com
sfrazier@bafirm.com

*Attorneys for Relator RoseMarie De Souza*


DATED:  July 28, 2014

20